IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| SHARON FORD, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-12-0977 |
| BERRY PLASTICS CORPORATION, ET AL., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

The Plaintiff Sharon Ford has brought this action against the Defendants Berry

Plastics Corporation and Captive Plastics Corporation, doing business as Grafco Plastics (the

"Defendant").[1] The Plaintiff alleges claims of race discrimination and retaliation in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a); 2000e-3(a).[2] The

Defendant's Motion for Summary Judgment (ECF No. 34) is pending before this Court.

---

[1] According to the parties, Grafco Industries was acquired by Captive Plastics, Inc. in October 2006 (ECF Nos. 34-1 n.1, 35-2 n.2 & 36 n.1). Berry Plastics Corporation then acquired Captive Plastics, Inc. in February of 2008. ECF No. 34-1 n.1. The parties also do not contest that Berry Plastics Corporation is the surviving successor in interest of Grafco and Captive, and is responsible for any potential liability in this case. Thus, although the Plaintiff was never a Berry employee, this Court refers to Grafco, Captive, and Berry collectively as "Defendant." Also, this Court notes that the parties indicate that Captive Plastics, Inc. is incorrectly named as Captive Plastics Corporation in the case style of this action.

[2] The Plaintiff has indicated that she has withdrawn the claim of gender discrimination in Count I of her Amended Complaint "because she was unable to develop it through discovery." Opp. to Mot. for Summ. J., ECF Nos. 35 at 2, 35-2 at 1. Therefore, the Defendant's Motion is MOOT as to this claim, and Count I is accordingly DISMISSED.

The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, the Defendant's Motion for Summary Judgment (ECF No. 34) is GRANTED IN PART and DENIED IN PART. Specifically, the Defendant's Motion is granted as to the race discrimination claim in Count II, and the Motion is denied as to the retaliation claim in Count III.

BACKGROUND

This Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Plaintiff is an African American woman. Pl.'s Opp. to Mot. for Summ. J., ECF No. 35-2 at 2. The Defendant is a manufacturer of plastic bottles. *Id.* In 1996, the Defendant hired the Plaintiff to work part time at its factory in Hanover, Maryland. *Id.* The factory runs twenty-four hours a day, seven days a week. D'Orsogna Dep., Def.'s Ex. 2 at 73-74, 79. The Plaintiff became a full-time employee in 1997 and worked in that capacity until she voluntarily left for another job in 2000. Pl.'s Dep. 34-36. In November of 2004, the Plaintiff was rehired by the Defendant, and worked full time as a Packer, an hourly position whose job duties included examining bottles for defects and packing the bottles into boxes or onto pallets. *Id.* at 54, 60, 63; D'Orsogna Dep. 74-79. Other hourly employees at the factory included Material Handlers, who made boxes and moved packed products off the factory floor. *Id.* Packers were regularly required to perform the functions of Material Handlers, and vice versa, in order to cover for employees who were on breaks. *Id.* Also at the factory were Machine Operators, who worked the various bottle-making machines. D'Orsogna Dep. 74. In 2006, there were

2

approximately sixty to eighty employees on the floor of the Defendant's Hanover factory. ECF No. 35-2 at 2. The workforce at the factory was approximately 60% African American, 20% Caucasian, and 20% Filipino. *Id.* at 2-3; D'Orsogna Dep. 143-44.

Plaintiff worked for several supervisors at the factory, including Brett Morris, Ian Hamilton, Matt Conard, and Derrick or Derek (last name unknown). Pl.'s Dep. 87-88. Those supervisors were overseen by Plant Manager Chris D'Orsogna. *Id.* at 63. In her second stint of employment at the factory beginning in 2004, the Plaintiff qualified for a promotion to the title of Packer Associate 2, earning an accompanying pay raise. ECF No. 35-2 at 2; D'Orsogna Dep. 29. The Plaintiff also received quarterly bonuses for productivity. Pl.'s Dep. 244-45.

Beginning shortly after her rehiring, the Plaintiff was the recipient of unwelcome verbal advances by several of the Defendant's employees. The first instances of unwanted comments came from co-worker Jimmy Wright, a maintenance worker who is Caucasian. *Id.* at 99. In late 2004 through summer 2005, Wright repeatedly asked the Plaintiff out on dates or to his house, bragged about his money, and offered to be her "sugar daddy" because he heard she "liked white guys with money." *Id.* at 124-30. The Plaintiff told Wright that he was "annoying" but neither specifically told him to stop nor reported his behavior to a superior. *Id.* at 128-30.

The Plaintiff also alleges inappropriate conduct by the Plant Manager D'Orsogna, a Caucasian male. In 2005, while the Plaintiff and a female co-worker "Fran" were eating lunch together, D'Orsogna made unwanted comments to both women. *Id.* at 101-02.

3

D'Orsogna said, "Fran, you can't have me. I have a wife and two other women," repeating the statement three times. *Id.* Then, D'Orsogna handed his cell phone to the Plaintiff and said, "You have a call on my cell phone. Here, take it . . . It's from the boss upstairs. He wants to pay you $20 an hour." *Id.* The Plaintiff states that she does not know what D'Orsogna meant by his comments to her.[3] *Id.* at 102. Shortly thereafter, the Plaintiff was assigned by supervisor Morris to work on a machine that was visible from D'Orsogna's office. *Id.* at 102-03. The Plaintiff heard from two co-workers that Morris stated in a meeting that D'Orsogna would be happy that the Plaintiff was working near his office. *Id.* D'Orsogna later told the Plaintiff in a seductive manner that he was glad that she was assigned to work a machine near his office. *Id.* The Plaintiff suspected that Morris and another employee, Joe Gallagher, were monitoring her conversations and relaying them to D'Orsogna and to Plant Administrator Marlene Pifer. *Id.* at 173-76. In May 2006, the Plaintiff gave D'Orsogna a bottle of wine for his birthday. *Id.* at 180-87. The Plaintiff stated that she did so because D'Orsogna had been nice and respectful to her, but also because he was mean to others and she thought that no one had ever done anything nice for him. *Id.* at 172, 180. Around the same time, rumors spread around the factory that the Plaintiff and D'Orsogna were dating. *Id.* at 181-82. Other employees would point and laugh at the Plaintiff, and encourage her to spend time with D'Orsogna whenever he was in a foul mood. *Id.* at 184-90. The Plaintiff did not report D'Orsogna's behavior to any of the Defendant's

---

[3] The record reflects that the Plaintiff made $9.35 per hour. Pl.'s Dep. 64.

personnel, stating that "I like to gather a lot of stuff before I go and complain against somebody who's a manager." *Id.* at 279.

In the summer of 2006, co-worker Kelvin Smith, a Machine Operator who is African American, made various lewd comments to the Plaintiff, and to other employees within earshot of the Plaintiff, including telling her about his genitals and asking her about her pubic hair. *Id.* at 118-19, 167. Smith also took pictures of the Plaintiff and other female employees with his cell phone when they bent over. *Id.* at 118-24. Additionally, Smith suggested that, because the Plaintiff had returned to work late one evening to meet with Plant Manager D'Orsogna, the two were having a sexual relationship. *Id.* at 167. The Plaintiff complained about Smith's behavior to Morris, who reported the complaint to D'Orsogna. *Id.* at 120. D'Orsogna immediately suspended Smith, and the Plaintiff had no further issues with Smith after his suspension. *Id.* at 122-24.

The Plaintiff also claims that Paul Horgan, an employee in the Defendant's Human Resources department, accessed information from the Plaintiff's personnel file without authorization, such as her age, whether she had children, and her home address. *Id.* at 151, 241-42. Horgan released this information to a Curtis Dodson, who was a supervisor, but did not work with the Plaintiff. Am. Compl. ¶¶ 12-13. In addition, Pat Stapleton, another Human Resources employee, told the Plaintiff that Horgan made inappropriate comments about the Plaintiff being in such good shape for her age, but was told to stop by D'Orsogna. Pl.'s Dep. 156. The Plaintiff stated that she was not offended by that statement. *Id.* at 160-61. Even so, the Plaintiff complained to Stapleton about Horgan's conduct in late 2004.

Am. Compl. ¶ 17. At Stapleton's direction, Horgan apologized to the Plaintiff. Pl.'s Dep. 162. Following Horgan's comments and release of the Plaintiff's personal data, other employees at the factory began making inappropriate comments to the Plaintiff about her looks and her age. *Id.* at 163-64. The Plaintiff did not make any further complaints about Horgan's conduct.

The Plaintiff also alleges that Morris forced African American employees to do the work of white co-workers. Specifically, Morris "told all the white Material Handlers that they can sit on the side, and he told them he would approach every Packer – and told us to take on the Material Handlers' responsibility." *Id.* at 132. In general, three female Caucasian Material Handlers were allowed to take more breaks than others, some of which breaks lasted all day. *Id.* at 133-38, 274-75, 280-81. On three separate occasions, the Plaintiff was instructed to cover their responsibilities while they took breaks. *Id.* In July of 2005, the Plaintiff complained to Morris and Hamilton about assigning more duties to African American workers. *Id.* at 288. The Plaintiff further complained to D'Orsogna about Morris's conduct. *Id.* at 139-40. Shortly after the Plaintiff complained, D'Orsogna offered the Plaintiff a position as a team leader. *Id.* at 140. The Plaintiff declined the offer because she did not want to take on more responsibility and wanted to focus on working on her independent record label. *Id.* at 140-41. After lodging her complaint to D'Orsogna, the Plaintiff was never asked by Morris to perform the work of a Material Handler again, although the Plaintiff states that the Caucasian female Material Handlers themselves

continued to shirk their duties. *Id.* at 144. The Plaintiff did not complain further on this issue. *Id.* at 145-46.

During the relevant time period, the Defendant had an attendance policy outlined in an internal document entitled "Attendance Procedure – Hourly" that was governed by a point system. ECF No. 35-2 at 3-6; Pl.'s Ex. 3. For each incident of lateness or leaving work early, an employee was assessed one-half of a point. Pl.'s Ex. 3. For missing work entirely, an employee was assessed a full point. *Id.* at 1-2. If an employee missed more than one day of work in a row for documented illness, the entire occasion of absence counted for one point, instead of a separate point for each missed day. *Id.* An employee who worked for thirty days without incurring any points would have a point deducted from his or her total. *Id.* at 3. Points would not be incurred for leave taken pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, but would be if an employee called in sick without taking FMLA leave. D'Orsogna Dep. 119-20. The policy dictated that the employee would receive written notice if his or her total reached three, four, or five points. Pl.'s Ex. 3 at 4. The supervisor was responsible for providing written notice on forms provided by the Defendant. *Id.* at 4-5. If the total reached six points, the employee could be terminated. *Id.* at 4. The Plaintiff testified that she and other employees knew the point system, but stated that she never saw the written "Attendance Procedure – Hourly" document. Pl.'s Dep. 70, 196-97.

The Plaintiff alleges that the point system was not consistently applied. Pl.'s Opp. at 6-8. For example, reaching six attendance points did not guarantee termination. Pl.'s Opp.

at 5. Some employees were not terminated until they reached up to eleven-and-a-half points, while others had greater than six points but were not fired. D'Orsogna Dep. 142-44, 205-09. The Plaintiff also alleges that race played a role in the point system. She states that Caucasian employees who were late to their shifts were not assessed a half point for lateness, but rather Morris would tell them not to clock in so he could manually enter them as having arrived on time. Am. Compl. ¶ 79; Pl.'s Dep. 227-31. Similarly, if Caucasian employees forgot their badges and were unable to clock in, Morris would mark them on time with no questions asked. Am. Compl. ¶ 82.

The Plaintiff also alleges that employees who were not African American were allowed to miss work for extended periods without incurring points. Jimmy Wright missed work to undergo heart surgery, which qualified him for FMLA leave. Am. Compl. ¶ 98; Affidavit of Terry Rice, Pl.'s Ex. 7 ¶ 13. In addition, Filipina employee Alma Sajol,[4] shortly after beginning her employment at the factory, was allowed to take thirty days off to get married, without incurring any points. Pl.'s Opp. at 8; Pl.'s Dep. 234-36. Such exceptions to the point system were not made for African American employees. Pl.'s Opp. at 8. Indeed, the Plaintiff claims that other employees told her that as of October 2006, all African American employees were assessed five-and-one-half points. Am. Compl. ¶ 90; Pl.'s Dep. 231-32.

With regard to the Plaintiff in particular, she alleges that she received more points than she should have earned through absences. Pl.'s Opp. at 9-11. On October 11, 2006,

---

[4] In the Plaintiff's Opposition, this employee is referred to as Alma "Pujol." Pl.'s Opp. at 8.

the Plaintiff returned to work after being absent for an illness. *Id.* at 10. Morris told her that as of October 8, 2006, she had accumulated enough points to be terminated. Pl.'s Dep. 264-65; Morris Dep. 108-09, 130-35, 145-46. Morris had not provided the notice required by the policy, although he testified that he did not follow the written notice procedure for any employees. Pl.'s Dep. 230-31; Morris Dep. 98-101, 105. By the Plaintiff's calculations, she should only have been assessed three-and-one-half points. Am. Compl. ¶¶ 114-16. When Plaintiff produced a doctor's note stating that she had been in the emergency room and needed to see a specialist for abdominal pain, Morris told the Plaintiff that she would still get a point if she was absent for surgery. Am. Compl. ¶¶ 120-21; Pl.'s Dep. 236. According to the Defendant's attendance policy, a doctor's note would ensure that an absence that spanned multiple days counted for only one point, but did not allow an employee to avoid a point altogether. Pl.'s Ex. 3 at 2. The Plaintiff did not request FMLA leave, nor did any of Defendant's personnel suggest that she do so. Pl.'s Dep. 237; Pifer Dep. 40. The Plaintiff complained to Morris about employees of other races getting better treatment with regard to points for absences. Am. Compl. ¶ 113; Pl.'s Dep. 284-85, 287-88. It was later discovered by the Plaintiff that co-worker Gail Venzke, a Caucasian woman, was late for work ten times in May 2006, but did not earn any attendance points. Absentee Calendar, Pl.'s Opp. Ex. 16 at 2.

On October 12, 2006, the Defendant summoned the Plaintiff to a meeting in D'Orsogna's office for the purpose of discussing her attendance. Pl.'s Opp. at 11-13. Pifer, the Plant Administrator who handled various personnel issues, was also present, along with

supervisors Morris and Conard.  Am. Compl. ¶ 129; D'Orsogna Dep. 161.  The Plaintiff disputed the number of points that the Defendant's personnel attributed to her.  Pl.'s Dep. 106.  D'Orsogna became angry and decided to terminate the Plaintiff.  Am. Compl. ¶ 144; Pl.'s Dep. 106-08.  At the same meeting the Plaintiff also alleges that D'Orsogna told the Plaintiff that, despite the number of points she had accumulated, she could "have as many chances as you want."  Pl.'s Dep. 100-01.  Ultimately, D'Orsogna decided that because Morris had failed to provide the Plaintiff with written notice of her point total, she would not be suspended or terminated immediately.  D'Orsogna Dep. 171-74.  Despite the Plaintiff's claim that she had earned only three-and-a-half points, she signed a form stating that she had six points.  Pl.'s Notice of Absentee Occurrence, Am. Compl. ¶ 144 Ex. 12. The Plaintiff was placed on a thirty-day probationary period with the understanding that if she had any "issues" with attendance or other conduct, she would be terminated.  Pl.'s Dep. 111-12; D'Orsogna Dep. 170.

On October 16, 2006, Morris approached the Plaintiff while she was working on the factory floor.  Pl.'s Dep. 208-09.  The Plaintiff was wearing earplugs of two different types because the string holding her usual pair together had broken.  *Id.* at 213.  Morris, thinking that the Plaintiff was wearing earbuds (headphones) against company policy, instructed the Plaintiff to remove them from her ears.  Am. Compl. ¶ 148; Pl.'s Dep. 208-09.  The Plaintiff, who claims that she did not hear Morris ask her to do anything, kept working.  Pl.'s Dep. 212-14.  The Plaintiff also stated that she could not stop the belt or stop working unless

another employee relieved her. *Id.* at 212-13. The Plaintiff states that Morris fabricated the encounter. Pl.'s Opp. at 13.

Morris told Pifer of the perceived safety concern and the Plaintiff was called into another meeting. Pifer Termination Report, Pl.'s Opp. Ex. 18. Morris stated that the Plaintiff yelled at him after he warned her about her earplugs. Morris Dep. 160-70. Pifer noted that the Plaintiff stormed out of the meeting twice, having to be escorted back into the room. Pl.'s Opp. Ex. 18. D'Orsogna made the ultimate decision to terminate the Plaintiff on October 16, 2006. ECF No. 35-2 at 13-15; D'Orsogna Dep. 187-88; Pifer Dep. 60-62. The Defendant's stated reason for terminating the Plaintiff was insubordination and points. Pl.'s Exs. 13, 18.

The Plaintiff makes no allegation concerning the identity, gender, or race of any employee who replaced her in the Packer position. The Plaintiff does allege, however, that shortly after she was terminated, Caucasian female co-worker Venzke was disciplined twice for yelling at Morris and other employees. Incident Reports, Pl.'s Opp. Exs. 15, 17. Venzke was not suspended or terminated. *Id.*

The Plaintiff filed a complaint with the Equal Employment Opportunity Commission on August 9, 2007. The EEOC made its determination on September 16, 2011 and issued the Plaintiff a Right to Sue letter on November 15, 2011. Am. Compl. ¶ 196. The Plaintiff filed suit in the Circuit Court of Maryland for Anne Arundel County on February 13, 2012. The case was removed to this Court and the Plaintiff filed a Verified Amended Complaint

(ECF No. 4) on March 29, 2012. After discovery, the Defendant moved for summary judgment.

For the reasons articulated below, the Defendant's Motion for Summary Judgment (ECF No. 34) is granted in part and denied in part.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. A party opposing summary judgment must "do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

<u>ANALYSIS</u>

## I.     Race Discrimination

Title VII of the Civil Rights Act of 1964, provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In a Title VII case such as this, where the record contains no direct evidence of discrimination, plaintiff's claims must be analyzed under the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first make out a prima facie case of discrimination. If a prima facie case is established, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for its adverse employment action. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). If the employer fulfills this burden of production, the burden reverts back to the plaintiff to establish that the defendant's proffered reason is pretextual and that her termination was instead racially motivated. *See id.*

In her Opposition, the Plaintiff argues that she suffered disparate treatment on the basis of her race when the Defendant discharged her employment, and otherwise discriminated against her with respect to the terms and conditions of employment.

A. Disparate Treatment – Terms and Conditions of Employment

The Plaintiff alleges that the Defendant subjected her to disparate treatment on the basis of race by forcing her to do the work of Caucasian employees and by applying the attendance point system more harshly to her than to Caucasians. To establish a prima facie case of disparate treatment with respect to terms and conditions of employment, a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Qualls v. Giant Food, Inc.*, 187 F. Supp. 2d 530, 533 (D. Md. 2002).[5]

At the outset, this Court must address the timeliness of the Plaintiff's race discrimination claim. Pursuant to Title VII, a plaintiff generally must file a discrimination charge with the EEOC within 180 days after the alleged unlawful employment practice. *Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 661 (D. Md. 2011). That limitations period is extended to 300 days in a "deferral state," "one in which state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Id.* (citations and internal quotation marks omitted). Because Maryland, the state in which the

---

[5] The Plaintiff asserts a single count of racial discrimination. In her Opposition, the Plaintiff specifically refers to this claim as one for discriminatory discharge. However, she also presents evidence of discrimination in the terms and conditions of employment. Thus, this Court construes the Plaintiff's arguments as asserting both types of claims of disparate treatment.

Plaintiff was employed by the Defendant, is a deferral state, the Plaintiff was required to file a charge with the EEOC within 300 days of the alleged unlawful employment practice. *Id.* at 661-62.

The Plaintiff alleges that the discriminatory conduct occurred in July of 2005, and testified that after she complained, Morris stopped ordering her to do any other employee's work. Pl.'s Dep. 144. The Plaintiff did not file her EEOC charge until August 9, 2007, well outside the limitations period for the acts of alleged discrimination in July of 2005. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). In her Opposition, the Plaintiff does not address the Defendant's legal argument that her claim in this regard is untimely. The Plaintiff likewise has not made any argument that the limitations period should be tolled or extended on equitable grounds, and this Court concludes that no grounds exist to do so. *Morgan*, 536 U.S. at 113. Accordingly, the Plaintiff's claim of racial discrimination based the events of July 2005 is barred by Title VII. In fact, counting back 300 days from the Plaintiff's EEOC charge filing, the earliest date within the limitations period is October 14, 2006, only two days before the Plaintiff was terminated. Thus, only acts by the Defendant taken from October 14, 2006 forward can form the basis for her claim under *Morgan*, 536 U.S. at 113. The only alleged action by the Defendant after that time is the Plaintiff's termination on October 16, 2006. *See, e.g.*, Am. Compl. ¶ 192 ("Because Plaintiff had been terminated on October 16, 2006, she was timely in initiating her administrative complaint."). The Plaintiff's allegations concerning disparate

application of the attendance policy that took place on or before October 13, 2006 are thus time barred.  *See Morgan*, 536 U.S. at 114 ("While [the plaintiff] alleged that he suffered from numerous discriminatory and retaliatory acts from the date he was hired through [ ] the date he was fired, only incidents that took place within the timely filing period are actionable."). Accordingly, because the only factual basis for the Plaintiff's disparate treatment concerns her discharge, this Court's analysis turns to the elements of the specific claim of disparate treatment based on discriminatory discharge.

### B.  Disparate Treatment – Discriminatory Discharge

The Plaintiff also argues that the Defendant discharged her on the basis of race.[6]  To make out a prima facie case of disparate treatment based on discriminatory discharge under the *McDonnell Douglas* scheme, the Plaintiff must demonstrate that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).[7]

---

[6] The Defendant incorrectly argues that discriminatory discharge is a completely separate claim, when it is in fact a type of disparate treatment claim.  *See, e.g.*, *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336-37 (4th Cir. 2011) (affirming district court's grant of summary judgment to employer on plaintiff's claim of "disparate treatment based on discriminatory discharge").  Because *McDonnell Douglas* dealt with discrimination in hiring, that decision did not specifically address what elements apply to a case of discriminatory firing.  *See* 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations.").  Accordingly, courts have adapted the elements required to make a prima facie case of discrimination when a disparate treatment allegation relates to discriminatory discharge.  *See, e.g.*, *Smith v. Univ. of N.C.*, 632 F.2d 316, 332 (4th Cir. 1980).

[7] There is a split among the circuit courts of appeals as to the requirement that a plaintiff show that

As was reiterated by the United States Court of Appeals for the Fourth Circuit in the *Hill* case, making a prima facie case of disparate treatment based on discriminatory discharge requires a showing that a plaintiff was replaced by an individual outside the protected class. *Id.* The Plaintiff is in two protected classes—women and African Americans. However, the Plaintiff does not address this element of a discriminatory discharge claim in her Opposition. The Plaintiff has not even alleged, let alone produced evidence, that she was replaced either by a male or by a non-African-American person. Without such evidence, the Plaintiff cannot meet the fourth element of a prima facie case. Accordingly, applying the Fourth Circuit standard, the Plaintiff's claim of disparate treatment based on discriminatory discharge must fail. *Brown*, 159 F.3d at 905-06; *Hill*, 354 F.3d at 285. Thus, summary judgment in favor of the Defendant is warranted as to the Plaintiff's disparate treatment claim in Count II.

## II. Retaliation

In Count III of the Verified Amended Complaint, the Plaintiff alleges that her employment was terminated in retaliation for her complaints of gender and race

---

he or she was replaced by an individual outside the protected class. *Compare Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998) ("In order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class."; affirming the holding of Judge Nickerson of this Court that a male plaintiff who was replaced by another male could not state a prima facie case of sex discrimination), *with Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1228-29 (10th Cir. 2000) ("[A] plaintiff alleging discriminatory discharge ordinarily need not show that a person outside of the protected class was hired to fill his former position in order to make out a prima facie case of discrimination."). The law of the Fourth Circuit is clear that the Plaintiff must, subject to certain exceptions not applicable in this case, show that the position remained open or was filled by a similarly qualified applicant outside her protected classes to make a prima facie case. *Brown*, 159 F.3d at 905-06; *Hill*, 354 F.3d at 285.

discrimination.

A.  Exhaustion of Administrative Remedies

The Defendant first argues that this Court lacks jurisdiction over the Plaintiff's retaliation claim because she failed to exhaust administrative remedies.  To secure standing under Title VII, a plaintiff bringing suit must exhaust applicable administrative remedies.  *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  The United States Court of Appeals for the Fourth Circuit has stated that with respect to a court's determination of the parameters of a Title VII lawsuit:

> The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint. Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) (citations omitted).  Therefore a plaintiff is barred from pursuing claims set forth in a Title VII complaint that were not previously subjected to administrative investigation.  *See Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981) (noting that "the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination").

In her November 9, 2007 EEO Complaint, the Plaintiff asserted gender and race discrimination, but did not check the box for retaliation.  Through the investigation of the gender and race discrimination claim, however, the EEOC found probable cause for a retaliation claim.  Pl's Ex. 14, ECF No. 35-16.  All three claims relate to the same time frame

18

and involve the same actors. *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005) ("We hold that a plaintiff fails to exhaust his administrative remedies where, as here, his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit."). Also, the same statutory scheme governs all three claims. 42 U.S.C. §§ 2000e *et seq.* The Defendant cannot seriously argue that it did not have notice of the nature and scope of all of the Plaintiff's claims. The Plaintiff's retaliation claim is reasonably related to her claims of gender and race discrimination, and was developed by reasonable investigation. *See Wilson v. Gates*, No. RDB-09-1074, 2010 WL 2639877, at *4-5 (D. Md. June 29, 2010) (holding that plaintiff had exhausted administrative remedies as to race discrimination claim despite EEO Complaint alleging only hostile work environment and retaliation claims), *aff'd per curiam*, 427 F. App'x 265 (4th Cir. May 3, 2011). Accordingly, the Plaintiff has exhausted all applicable administrative remedies and her retaliation claim must be addressed on its merits.

   B. <u>Prima Facie Case of Retaliation</u>

   The *McDonnell Douglas* framework that applies to discrimination claims is also applicable to retaliation claims. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 n.1 (4th Cir. 2000) (citation omitted). To establish a prima facie case of retaliation under *McDonnell Douglas*, Plaintiff must prove that (1) she engaged in a protected activity; (2) the defendant took an adverse employment action against her; and (3) a causal nexus exists between the protected activity and the adverse employment action. *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998). If a plaintiff successfully alleges a prima facie case of retaliation, the defendant

faces a burden of production to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *O'Connor*, 517 U.S. at 311. If the defendant meets its burden of production, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is a pretext for discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 507-08. Courts have emphasized that a plaintiff's "burden to demonstrate pretext 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Hill*, 354 F.3d at 285 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

As to the first element of a prima facie case of retaliation, opposition to an employer's policies by formal or informal complaints qualifies as protected activity. *See, e.g.,* *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."). The Plaintiff alleges that she engaged in protected activity on the following occasions: (1) in July 2005, she complained to D'Orsogna that Morris was treating Caucasian Material Handlers more favorably than African American employees; (2) in July 2005, she complained to Stapleton that Horgan had improperly released information in her personnel file; (3) in the summer of 2006, she complained to Morris that Kelvin Smith was making sexual comments to her; and (4) in October of 2006, she complained that Morris unfairly assessed her attendance points on the basis of race. ECF No. 35-2 at 24-25. These were oppositional activities that meet the definition of protected activity pursuant to Title

VII.  As to the second element of a prima facie case, termination is clearly an adverse employment action.

Having established the first two elements of a prima facie case of retaliation, the Plaintiff must show that a causal nexus exists between the protected activity and the adverse employment action.  *Causey*, 162 F.3d at 803.  "A prima facie showing of causation requires little proof."[8]  *Dea v. Wash. Suburban Sanitary Comm'n*, 11 F. App'x 352, 364 (4th Cir. 2001).  The Fourth Circuit has held that "a causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity."  *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004).  Conversely, a longer passage of time "tends to negate the inference of discrimination."  *Id.*  Temporal proximity is, however, just one means by which to show causation.  *See Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 613 (D. Md. July 26, 2012) ("[P]laintiffs may state a prima facie case of causation by relying on evidence other than, **or in addition to**, temporal proximity where such evidence is probative of causation.") (emphasis in original, citation and internal quotation marks omitted).

In this case, the first and second instances of protected activity, in July 2005, took place more than one year before the Plaintiff was terminated.  This time interval is too long

---

[8] Recently, the Supreme Court clarified that the plaintiff must *ultimately* prove that the alleged discriminatory action was the "but for" cause of the adverse employment action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___ , 133 S. Ct. 2517, 2533 (2013) (vacating affirmance of a jury verdict for the plaintiff on retaliation claim; holding that Title VII's relaxed "motivating factor" causation standard for status-based discrimination claims does not apply to retaliation claims).  A plaintiff at the summary judgment stage, however, is not required to conclusively establish the causal connection required to ultimately prevail, but rather faces a "less onerous burden of making a *prima facie* case of causality."  *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

to establish a prima facie case of causation based on temporal proximity alone. *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (three to four months is "too long to establish a causal connection by temporal proximity alone"). Neither has the Plaintiff presented additional evidence to connect her complaints in July 2005 to her termination. Indeed, after the Plaintiff complained about conduct by Morris and Horgan in July 2005, she made no more complaints regarding those issues. Pl.'s Dep. 144. In particular, the Plaintiff seemed to recognize the tenuousness of the link between her complaint against Horgan and her termination. When asked why she thought Horgan retaliated against her for her July 2005 complaint, the Plaintiff replied only that they "were never really on speaking terms after that." Pl.'s Dep. 241. In sum, the Plaintiff has not alleged any additional probative facts to show a connection between protected activity in July 2005 and her termination in October 2006.

However, the Plaintiff also engaged in protected activity in sufficiently close temporal proximity to establish causation. In the summer of 2006, The Plaintiff complained that co-worker Smith sexually harassed her. While it is unclear exactly how much time passed between this complaint and the process that led to the Plaintiff's termination, the interval could have been as little as two months. The Defendant's argument that the Plaintiff's complaint against Smith "has no bearing on her termination" (ECF No. 34-1 at 33) does not negate an inference of a causal nexus. Despite the fact that the Plaintiff has withdrawn her stand-alone claim for gender discrimination, her complaints of sexual harassment may still support her retaliation claim. *See Morgan*, 536 U.S. at 113 (Title VII does not bar an

employee from using acts that are not independently actionable as background evidence in support of a claim).

Likewise, the Plaintiff also engaged in protected activity in October 2006, the same month she was terminated, by complaining about the race-based application of the attendance point system. The very short time between the protected activity and the Plaintiff's termination is sufficient at this stage to meet the causal nexus burden. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (recognizing that courts uniformly hold that temporal proximity must be "very close" to make a prima facie case of causation on that basis alone). Although summary judgment is granted in favor of the Defendant as to her race discrimination claim, her complaint to her employer regarding those circumstances may support a retaliation claim. *Morgan*, 536 U.S. at 113. When viewed as a whole and in the light most favorable to the Plaintiff, the events of October 2006 give rise to a showing of a causal nexus between protected activity by the Plaintiff and her ultimate termination. Thus, the Plaintiff has made a prima facie case of retaliation pursuant to Title VII.

C. Legitimate Nondiscriminatory Reason

Because the Plaintiff has stated a prima facie case of retaliation, the Defendant faces the burden to articulate a legitimate nondiscriminatory reason for discharging her. In this case, the Defendant stated that the Plaintiff was terminated for violation of the attendance point policy and for insubordination. These are legitimate reasons for termination. *See, e.g.*, *Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 656 (D. Md. 2010) ("Violation of company policy has been recognized as a legitimate reason for terminating an employee." (citing

*Brantley v. Nationwide Mut. Ins. Co.*, No. RDB-07-1322, 2008 WL 2900953, at *11-12 (D. Md. July 22, 2008))). Although the Plaintiff disputes the Defendant's calculation of her attendance points, as well as the veracity of her superiors' accounts of her insubordination, the employer's perception is the relevant inquiry. *See id.* at 657 (citing *Jarvis v. Chimes*, No. RDB-06-1197, 2008 WL 623402, at *12 (D. Md. Mar. 4, 2008) (even if decisionmakers decided to terminate an employee on the basis of incomplete information, it is not the province of the courts "to decide whether [the employer's] reason was 'wise, fair, or even correct, ultimately, so long as it truly was the reason'" (citation omitted))). Thus, the Defendant has met its burden of production to articulate a legitimate nondiscriminatory reason for terminating the Plaintiff. Accordingly, the burden shifts back to the Plaintiff to show that the stated reasons were merely a pretext for discriminatory action.

D. <u>Pretext</u>

The burden to demonstrate pretext "merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. A plaintiff may carry this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the proffered explanation is unworthy of credence." *Id.* However, a plaintiff's bald assertion that a defendant lied about the proffered reason for termination is insufficient to survive a motion for summary judgment. *Gibson*, 718 F. Supp. 2d at 657 (citing *Vickers v. Powell*, 493 F.3d 186, 195-96 (D.C. Cir. 2007)). Ultimately, the plaintiff bears the burden to prove, by a preponderance of the evidence, that "unlawful animus" was the real reason for the adverse

employment action. *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995) ("[T]he plaintiff must prove both that the reason was false, *and* that discrimination was the real reason for the challenged conduct.") (emphasis in original, citation and internal quotation marks omitted).

This Court cannot conclude as a matter of law that the Defendant's stated reasons for discharging the Plaintiff were not a pretext for discrimination. A reasonable jury could conclude that the real reason for the Plaintiff's termination was not her absenteeism or insubordination, but rather was a reprisal for her complaints about unfair treatment based on gender and race.

First, there are a genuine disputes as to whether the Plaintiff had earned enough points to warrant termination and as to whether she was insubordinate on the day she was discharged. *Id.* The Plaintiff has presented evidence that she should have only had three-and-one-half points when she was put on probation. She also alleges that several employees were not terminated while having more than six points, while others were only discharged after they accumulated many more points than the six necessary to warrant termination under the attendance policy. This inconsistent application of the attendance policy could be perceived as mere leniency in some cases, or it may suggest that the Defendant wielded the point system like a cudgel to dissuade employees from complaining about work conditions. *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (an employment action is materially adverse if "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (citations and internal quotation marks omitted). In

other words, a reasonable jury could conclude that the Defendant's stated legitimate justification was not the real reason for terminating the Plaintiff. *Jiminez*, 57 F.3d at 377.

There is also a genuine dispute as to whether the true reason that the Defendant terminated the Plaintiff was in fact discrimination. *Id.* The Defendant terminated the Plaintiff shortly after she complained to her supervisor about racially disparate application of the attendance policy. The Plaintiff has presented evidence that management exaggerated her individual point total before putting her on probation, and that the policy was applied more harshly to African American employees in general. Furthermore, at the time of termination, the Defendant was aware of the Plaintiff's complaint about sexual harassment by Smith in the summer of 2006. The Plaintiff has also presented evidence that she and D'Orsogna, who ultimately terminated her, had a history of unusual personal interactions. Against that backdrop, there is a genuine issue of material fact as to whether the Defendant's true motivation was retaliatory. It is for a jury to decide whose explanation is more credible. *See Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 393, 396 (D. Md. 2010) (holding that "competing evidence" of reasons for termination created a jury question on *quid pro quo* sexual harassment and retaliation claims).

In sum, there remains a genuine dispute as to issues of material fact regarding whether the Plaintiff's termination on the basis of attendance points and insubordination was merely a pretext for discriminatory action. Accordingly, summary judgment is inappropriate as to the claim for retaliation in Count III.

<u>CONCLUSION</u>

For the reasons stated above, the Defendant's Motion for Summary Judgment (ECF No. 34) is GRANTED IN PART and DENIED IN PART. Specifically, the Defendant's Motion is GRANTED as to the race discrimination claim in Count II, and the Motion is DENIED as to the retaliation claim in Count III. Furthermore, as the Plaintiff has withdrawn her claim of gender discrimination in Count I, that Count is DISMISSED.

A Separate Order follows.

Dated:        September 27, 2013                    _____/s/_____
                                                    Richard D. Bennett
                                                    United States District Judge